ESTATE OF DELANO T. STARR, DECEASED, MARY W. STARR, EXECUTRIX, AND MARY W. STARR, INDIVIDUALLY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59307. Filed June 30, 1958.

*Roy B. Woolsey, Esq.,* for the petitioners.
*J. Earl Gardner, Esq.,* for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies in income tax and additions to tax of Delano T. Starr and Mary W. Starr as follows:

| Year | Deficiency | Additions to tax sec. 294 (d) (2) |
| --- | --- | --- |
| 1951 | $1,939.86 | $831.73 |
| 1952 | 1,155.14 | 429.05 |

Delano T. Starr died after the petition was filed and his widow, Mary W. Starr, executrix of the last will and testament of Delano T. Starr, was substituted in his stead.

The sole issue for decision is whether payments made for the installation of a building sprinkler system in the amount of $1,240 for each of the years 1951 and 1952 are deductible as rental expenses within the meaning of section 23 (a) (1) (A), I. R. C. 1939, or whether these payments are capital expenditures.

### FINDINGS OF FACT.

Delano T. Starr and Mary W. Starr were husband and wife during the years involved and resided at 131 East Hillcrest, Monrovia, California.

For the calendar years 1951 and 1952 Delano T. Starr and Mary W. Starr filed joint income tax returns with the collector of internal revenue at Los Angeles, California.

Throughout the period here involved Delano owned and operated the Gross Manufacturing Company, a sole proprietorship. Early in 1950 a general manager of the Gross Manufacturing Company suggested to Delano that insurance premiums on the building occupied by the company were quite large and should be reduced. The general manager suggested that some sort of sprinkler system be established in the building. Insurance premiums on the building occupied by the company were estimated to be in excess of $1,000 per year if the building was not protected by a sprinkler system. If the building was protected by a sprinkler system, the insurance premiums per year were estimated to be only $126.29.

On or about April 3, 1950, Delano T. Starr, doing business as Gross Manufacturing Company (hereinafter called petitioner), and "Automatic" Sprinklers of the Pacific, Inc. (hereinafter called Automatic), entered into a written agreement which provided for the installation of a sprinkler system. The sprinkler system was installed under and pursuant to said written agreement. This written agreement provided in part as follows:

LEASE FORM OF CONTRACT

"AUTOMATIC" SPRINKLERS OF THE PACIFIC, INC.
5508 Alhambra Ave.
Los Angeles 32, Calif.

INDENTURE OF LEASE, Made this 3rd day of April 1950 by and between the "AUTOMATIC" SPRINKLERS OF THE PACIFIC, INC., A corporation of the State of California, with an office at Los Angeles, California, hereinafter called the LESSOR and DELANO T. STARR, DBA GROSS MANUFACTURING COMPANY, having principal office at Monrovia, California, hereinafter called the LESSEE.

WITNESSETH:

That in consideration of the mutual covenants LESSOR and LESSEE hereto agree as follows:

ON THE PART OF LESSOR:

1. To install and lease for and during the term of five years from and after approval a wet pipe system of fire extinguishing apparatus, hereinafter referred to as the "system" in certain buildings all as indicated on the plan and shown in the specifications hereto attached in the property owned and occupied by the LESSEE located in Monrovia, California. Legal description of the property is as follows:

&ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

2. The system to be installed by LESSOR will be in accordance with the provisions and conditions of the specifications attached hereto and made a part hereof consisting of two sheets, with the exceptions noted, if any. All materials will be of standard quality and the work herein specified will be done in a thorough and workmanlike manner under the rules and regulations of NATIONAL FIRE PROTECTION ASSOCIATION and subject to inspection and approval by PACIFIC FIRE RATING BUREAU acting as agent of both LESSOR AND LESSEE.

3. LESSOR shall inspect the system at least one (1) time per year after its completion and approval and LESSOR shall repair or replace at its own expense any part if found to be defective or worn out under ordinary usage, provided LESSEE has used due diligence in maintaining the system in proper working order.

ON THE PART OF LESSEE:

4. LESSEE shall pay to the LESSOR, or its successors or assigns at Los Angeles, California, an aggregate rental of SIX THOUSAND TWO HUNDRED DOLLARS ($6,200.00) during the term of this lease, payable as follows:

One Rental Payment of $1,240.00 payable May 1, 1950.
One Rental Payment of $1,240.00 payable May 1, 1951.
One Rental Payment of $1,240.00 payable May 1, 1952.
One Rental Payment of $1,240.00 payable May 1, 1953.
One Rental Payment of $1,240.00 payable May 1, 1954.

All deferred rentals shall bear interest at the rate of 6% per annum after maturity.

5. LESSEE shall use due diligence in maintaining the system in proper working order and in compliance with Insurance Companies' requirements. Should the system become impaired on account of lack of diligence on the part of LESSEE in properly maintaining same, or if changes or extensions to the system should be required by the Insurance Companies' on account of changes in construction of, or extensions to the buildings, or on account of changes in the contents of the buildings, LESSEE shall notify LESSOR thereof in writing, whereupon LESSOR shall make the required changes in the system at the cost and expense of the LESSEE as soon after receipt of such notification as is practicable. The rentals becoming due and payable during the remainder of the term of this lease shall thereupon be increased in the amount sufficient to reimburse LESSOR for the materials furnished and labor performed.

6. The rentals stipulated in this lease are based on the assumption that the work of installing the system shall be done only during regular working hours. If overtime work is requested by the LESSEE, the same shall be paid for by the LESSEE as additional rental at the time the next rental payment or payments become due after the performance of such overtime work.

7. LESSEE will furnish at his own expense, as and where required by the LESSOR, all necessary space for the storage and handling of materials and proper facilities for the speedy and efficient prosecution of the work, including the services of watchman; also light, heat, local telephone service and (when available) elevator service, and unless expressly excepted, all painting, (both as to labor and materials), and permits as required by LESSOR for the installation of the system, and the sufficiency of all thereof both old and new including the property herein proposed to be equipped, is warranted by LESSEE.

8. LESSEE agrees that, if prior to the completion of the installation, the work be discontinued by reason of strikes, lockouts, action of the elements, or any cause not LESSOR'S Fault, there shall, at LESSOR'S option, be due and payable by LESSEE to LESSOR upon its demand, a sum equal to the full aggregate rentals stipulated herein less an allowance to be made by LESSOR for materials, labor and expense not supplied or incurred.

9. LESSEE will supply at his own expense throughout the term of this lease, all necessary water, steam, heat and power required to keep the system in proper working order, including sufficient heat to prevent freezing and will exercise due care and diligence in protecting the same from impairment, injury or destruction, and will promptly give to LESSOR written notice of any impairment, injury or destruction.

10. LESSEE will also promptly pay when due and payable, all taxes and assessments of every kind levied upon the land, buildings and contents protected by the system and in lieu of additional rent, upon the system itself and will keep the system (and the materials and component parts thereof during installation) at all times full [sic] insured in satisfactory insurance companies to at least an amount equal to the sum of the total unpaid rentals under paragraph 4 against loss by fire, lightning and wind storm, making "loss, if any, payable to "Automatic" Sprinklers of the Pacific, Inc., or its successors or assigns, as its interest may appear"; and deliver to LESSOR the policies for such insurance. In the event LESSEE fails to maintain insurance and/or to deliver to LESSOR the said policies, LESSOR may so insure the premises, including the system for its own benefit to the amount of its interest at the time, and pay the premiums therefore [sic] and upon payment of such premiums by the LESSOR, the same shall forthwith become due and owing from LESSEE to LESSOR without demand. LESSEE shall bear the risk of loss of said property and system from any cause whatsoever.

11. LESSEE will not alter, remove or dispose of, or permit the use by others of, the system, or any part thereof, without the written permission of LESSOR, and no discontinuance of ownership or operation of the plant or premises by LESSEE shall terminate or affect the liability of LESSEE hereunder.

12. It is hereby expressly understood and agreed that title to the system and all its component parts and materials shall be and remain indefeasibly vested in "AUTOMATIC" SPRINKLERS OF THE PACIFIC, INC., its successors or assigns, and said system shall not be or be deemed to be, a part of or incorporated into the real estate or be deemed to be a fixture.

THE LESSOR AND LESSEE MUTUALLY AGREE:

13. The following shall be deemed events of default: Failure of LESSEE to make rental payments or otherwise comply with obligations of this lease; appointment of a receiver for LESSEE'S property or business, adjudication of bankruptcy, assignment for benefit of creditors, seizure of the premises herein described by judicial process; the obtaining of a judgment against LESSEE, or the filing of a lien against LESSEE'S property, if said judgment or lien be not satisfied or discharged within ten (10) days thereafter.

14. Upon the happening of an event of default, LESSOR may in so far as permitted by law, resume possession of the system, which LESSEE agrees to deliver upon demand, and LESSOR or assigns shall have full right to enter any building structure or premises where said system, or any part thereof may be, and remove, control and/or shut the water off the same without resorting to legal process, and at the cost and expense of said LESSEE, the amount whereof as well as reasonable attorney fees and court costs in any litigation arising therein, shall be added to the balance then owing hereunder.

15. Upon the happening of an event of default, or in case the premises herein described are destroyed in whole or in part by fire, all remaining rental payments shall, at the option of LESSOR, immediately become due and payable, anything herein contained to the contrary notwithstanding. In case of fire, however, the total amount owing to LESSOR, less such amount as may be paid by the Insurance Companies direct to the LESSOR, shall be subject to discount from date of payment of fire loss to the date of scheduled maturity at the rate of six per centum (6%) per annum, and LESSEE may have the same rate of discount for any rentals it may be pleased to make before maturity.

16. All rights and remedies hereunder given to LESSOR are cumulative and not exclusive and its failure to exercise any right or remedy upon default shall not be construed as a waiver of the right to exercise the same upon succeeding default.

17. LESSOR shall not be liable for any work or materials not furnished by it, nor any loss or damage by reason of the care or character of any walls, foundations, or other structures not erected by it, and any loss or damage from any cause not the fault of LESSOR, to materials, tools, equipment, or work, while in or about the premises shall be borne by LESSEE.

18. If, in connection with the performance of this lease, any damage be cause [sic], or any claim be made, for which LESSOR may be liable, written notice with an itemized statement thereof, must be given to LESSOR promptly and in any event, within the (10) ten days, thereafter, otherwise LESSOR is released from liability.

19. All notices shall be in writing, served by registered mail upon the parties hereto respectively at their respective offices as hereinbefore set forth, or as hereafter designated in writing by one to the other.

20. The installation of the required number of Automatic Sprinklers, but no Open Sprinklers, is provided for in the specifications heretofore attached. The price shall not include the installation of extra sprinklers due to changes in the buildings or contents after the completion of LESSOR'S survey.

21. It is mutually understood and agreed that any work or materials not specifically described herein, together with what specifically the LESSEE is to supply, shall be supplied by LESSEE at his own expense, as and when required by LESSOR for the prosecution of the work. Upon LESSEE'S failure so to do, LESSOR may, at its option, as LESSEE'S agent, supply the same at market prices, and its expense by reason thereof, as well as those resulting from delay, shall be additional to the aggregate rentals mentioned herein and shall be paid to the LESSOR upon demand.

22. LESSOR shall not be liable for any loss or damage from delay or otherwise, due directly or indirectly, to strikes, lockouts, embargoes, transportation conditions, action of the elements, acts, orders, rulings, or restrictions of the U. S. Government, or of any instrumentality thereof, or to any cause beyond LESSOR'S control.

23. LESSOR shall have and is hereby given the right to assign this lease and the rental installments and the title to the system. In the event of any such

assignment, LESSEE, hereby waives any right of set-off, defense, or counter-claim, now or hereafter existing in favor of LESSEE against such assignee, without however, in any wise waiting or releasing his right to assert such claim as against LESSOR.

24. That the only agreements, obligations and covenants binding on the parties hereto are those set forth herein.

25. In the event of [sic] any of the provisions of this instrument shall be void or unenforcible under the laws of any state where its enforcement is sought, then it is agreed that the LESSOR may exercise all rights and remedies which are conferred upon conditional vendors or holders of chattel mortgages by the laws of the state in which its enforcement is sought, LESSOR to have the right to elect which remedy it will pursue.

26. LESSEE represents that the fee simple title to the land and/or buildings described in Paragraph 1 is vested in DELANO T. STARR and WIFE, as joint tenants; that LESSEE'S interest in said land and/or buildings is a fee simple title estate; that there are no encumbrances affecting the title to the said land and/or buildings and/or LESSEE'S interest therein.

This representation of fact is made to secure the execution of this lease.

Before any work is started under this lease, LESSEE agrees to procure the assent in writing of all the holders of said uncumbrances [sic] and of all the holders of interest or estates in said land and/or buildings to the provisions of this lease, provided that title to the system of fire extinguishing apparatus herein described shall remain in LESSOR and that said apparatus shall remain personally and not become a part of the realty during the term of this lease.

LESSEE further agrees that no liens or encumbrances of any sort will be placed upon its interest in the said land and/or buildings nor shall said land and/or buildings be sold without first procuring the assent of such lienor, encumbrances or purchaser to the said provisions of this lease.

27. This lease shall become a binding and obligatory agreement upon execution by LESSEE: provided, however, that it may thereafter, at the option of the LESSOR, be terminated and cancelled by LESSOR at any time within thirty (30) days after said lease has been received at the Los Angeles, California, office of LESSOR. If so terminated and cancelled, LESSOR shall immediately notify LESSEE.

28. At the termination of the period of this lease, if LESSEE has faithfully performed all of the terms and conditions required of it under this lease, it shall have the privilege of renewing this lease for an additional period of five years at a rental of $32.00 per year. If LESSEE does not elect to renew this lease, then the LESSOR is hereby granted the period of six months in which to remove the system from the premises of the LESSEE.

IN WITNESS WHEREOF, the parties herein have subscribed their respective names in duplicate this 3rd day of April A. D. 1950.

"AUTOMATIC" SPRINKLERS OF THE PACIFIC, INC.

By  Carl O. Gustafson
*President.*

DELANO T. STARR DBA GROSS MANUFACTURING COMPANY

Attest:
Olive L. Monson
June L. Gustafson
W. M. Anderson

Respondent allowed depreciation in the amount of $269.60 for each of the years 1951 and 1952, determined on the basis of a total cost

of the sprinkler system of $6,200 prorated over a remaining useful life of 23 years for the building from May 1950, when the system was installed.

During each of the years 1951 and 1952 petitioner paid $1,240 to Automatic pursuant to the contract.

Automatic installed building sprinkler systems on a cash basis and on an installment basis. The cash price of the sprinkler system of the type installed in the building occupied by petitioner's business was $4,960. The price of the same building sprinkler system on an installment contract basis with payments extending over a 5-year period was $1,240 per year, or a total of $6,200. The average installment contract entered into by Automatic covered a 5-year period, but customers purchasing building sprinkler systems have been allowed as long as 15 years to pay for a sprinkler system under an installment contract. Automatic has sold approximately 1,700 sprinkler systems.

The agreement between petitioner and Automatic was recorded on the books of Automatic as a long-term receivable and the profit therefrom was computed in the same manner as the profit from a sale. Automatic has installed approximately 25 building sprinkler systems under agreements of this type, and these agreements were entered into by Automatic to stimulate sales. Automatic has never removed a sprinkler system installed under one of these agreements.

Sprinkler systems sold for cash are only inspected once by Automatic. Sprinkler systems sold under contracts of the type between Automatic and petitioner were inspected at least one time per year for the first 5 years after installation. If the contract was renewed for an additional 5 years, Automatic inspected the sprinkler system during the second 5-year period for an additional service charge of $32 per year. The contract between petitioner and Automatic has been renewed for an additional 5 years and Automatic has been making an annual inspection of the sprinkler system installed under that contract. The cost of this annual inspection to Automatic is $64 per year.

The estimated useful life of the sprinkler system installed in petitioner's building is 20 years or more.

OPINION.

The sole question to be determined is whether payments made for the installation of a building sprinkler system in the amount of $1,240 for each of the years 1951 and 1952 are deductible as rental expenses under the provisions of section 23 (a) (1) (A) of the In-

ternal Revenue Code of 1939,[1] as contended by petitioner, or constituted capital expenditures as determined by respondent.

It is well settled that regardless of the form of the transaction, "rental" payments must be treated as partial payments of the purchase price of the property involved, if by virtue of the payments the taxpayer has acquired or will acquire title to, or an equity in, the property. *Quartzite Stone Co.*, 30 T. C. 511; *Ersel H. Beus*, 28 T. C. 1133 (on appeal C. A. 9). To properly determine the true character of the payment, it is necessary to ascertain the intention of the parties as evidenced by the written agreements, read in the light of the attending facts and circumstances existing at the time the agreement was executed. *D. M. Haggard*, 24 T. C. 1124, affd. 241 F. 2d 288. As stated in *Breece Veneer & Panel Co.* v. *Commissioner*, 232 F. 2d 319, 323 "[t]he intention of the parties cannot be determined unilaterally."

Throughout the period involved, petitioner owned and operated a manufacturing business, as a sole proprietorship. He owned the building in which the business was conducted. In 1950, in order to reduce the insurance premiums on the building, he entered into an agreement, designated a "Lease Form of Contract," with Automatic for the installation of a sprinkler system. The contract provided that petitioner should pay an aggregate "rental" of $6,200 covering a period of 5 years, payable in annual installments of $1,240 each, beginning May 1, 1950. At the termination of the 5-year period, petitioner was to have the privilege of renewing the "lease" for an additional 5 years at a "rental" of $32 per year. The contract further provided that title to the system should remain in the "lessor" and that if petitioner did not elect to renew the "lease" the "lessor" should have 6 months within which to remove it from petitioner's premises.

Officials of Automatic testified that the company sold sprinkler systems on both a cash and installment basis. The cash price of a sprinkler system was $4,960, and when sold under a 5-year installment contract it was $1,240 per year, or a total of $6,200. These officials further testified that the payment of $32 per year for the additional 5-year renewal period was a service charge for inspecting the sprinkler system. Automatic's bookkeeper testified that the profit from the transaction between petitioner and Automatic was computed on Automatic's books in the same manner as the profit from a

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) EXPENSES.—

(1) TRADE OR BUSINESS EXPENSES.—

(A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * *; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. * * *

sale. Other testimony indicated that Automatic devised the "Lease Form of Contract" to stimulate sales.

It thus appears from the contract and the testimony relating thereto that the "rental" payments of $1,240 in issue here were intended to be and were in fact partial payments of the purchase price of the sprinkler system involved. The total sales price of the same sprinkler system under a 5-year installment contract was the same as the aggregate "rental" payments under the "Lease Form of Contract" and the testimony of employees of Automatic indicates that the transaction was treated the same as a sale. The fact that the "rental" payments dropped off to $32 per year after the first 5 years is strong evidence that the annual payments of $1,240 per year for the first 5 years were intended as something more than mere payments for the use of the property.

It does not appear that the "Lease Form of Contract" was a more desirable way of obtaining a sprinkler system than by means of an installment sale. The reason for the installation of the sprinkler system was to reduce insurance costs, but these costs would have been reduced upon the installation of the sprinkler system regardless of the method of payment therefor. Moreover, testimony indicates that petitioner could have purchased the sprinkler system under very liberal installment terms providing for payment over a period as long as 15 years. Petitioner's motive in entering into the "Lease Form of Contract" was obviously to gain the tax benefit of a "rental" deduction for the annual payments of $1,240.

Petitioner relies strongly on the provision of the "Lease Form of Contract" which states that title to the sprinkler system remained at all times in Automatic in support of his contention that the payments in issue represented deductible rent. Though a factor to be considered, we do not think it controlling in the instant case when considered in the light of all the circumstances. Even if title has not passed to the "lessees," so-called "rental" payments may be treated as capital expenditures where the facts indicate that the "lessee" is acquiring not merely the right to use the property but a substantial equity in its ownership. See *Judson Mills*, 11 T. C. 25. Here, provisions of the "Lease Form of Contract" and other facts indicate that petitioner acquired a substantial equity in the sprinkler system. Under the "lease" petitioner agreed to pay all taxes levied against the sprinkler system and to maintain insurance on the system in at least an amount equal to the sum of the total unpaid rentals. Paragraph 25 of the "lease" gave Automatic all rights and remedies available to conditional vendors or holders of chattel mortgages in the event any of the provisions of the agreement became void or unenforcible. The provision in the contract, adverted to by petitioner, requiring the "lessor" to repair or replace defective or wornout parts at

its own expense was no more than a warranty customarily to be found in contracts of sale. Furthermore, Automatic's general manager testified that although the lease provided for a renewal of only 5 years beyond the initial 5-year period, the practice of the company was to permit renewal of "leases" beyond the initial renewal period and that the company had never removed a sprinkler system sold under a "Lease Form of Contract." He further testified that the estimated useful life of a sprinkler system was at least 20 years and that under installment sales contract agreements, Automatic has allowed as long as 15 years for the payment of the purchase price of a sprinkler system. Clearly, the facts show that petitioner acquired a substantial equity in the sprinkler system by the payment of $1,240 during each of the years 1951 and 1952, which interest is essentially the same that he would have acquired if he had purchased the same sprinkler system under an installment sale contract. The substance of the transaction is not changed by the formal contract provision that legal title remained in Automatic.

Likewise, the absence of a specific option to purchase upon payment of a further sum is immaterial where, as here, the entire purchase price of the sprinkler system was accounted for in the initial 5-year period and the payment of $32 per year thereafter represented a mere service charge for annual inspection of the system.

It was stated in *Chicago Stoker Corporation*, 14 T. C. 441, at 444–445:

Cases like this, where payments at the time they are made have dual potentialities, i. e., they may turn out to be payments of purchase price or rent for the use of the property, have always been difficult to catalogue for income tax purposes. A fixed rule for guidance of taxpayers and the Commissioner is highly desirable, and it is also desirable that the rule, whatever it is, be as fair as possible, both to the taxpayer and the tax collector. If payments are large enough to exceed the depreciation and value of the property and thus give the payor an equity in the property, it is less of a distortion of income to regard the payments as purchase price and allow depreciation on the property than to offset the entire payment against the income of one year. * * *

The above rule was quoted with approval by the Ninth Circuit Court of Appeals in *Oesterreich* v. *Commissioner*, 226 F. 2d 798, reversing a Memorandum Opinion of this Court.

Here, the payments are substantially in excess of the depreciated or undepreciated value of the property and the aggregate payments over the 5-year period equal the conditional sale price. The $32 payable yearly after the termination of the initial 5-year period does not represent even a token payment on the purchase price of the system but is intended to compensate the seller, at least in part, for its annual inspection of the system during the next 5 years. It is also to be noted that respondent has allowed depreciation of $269.60 on the sprinkler system for each of the years 1951 and 1952. Thus, in effect,

only \$970.40 of the \$1,240 payment was disallowed as a deduction for each of the taxable years. Since later depreciation deductions over the remaining useful life of the sprinkler system are allowable in those years in which only \$32 payments are due from petitioner under the "Lease Form of Contract," respondent's determination results in a less distorted picture of petitioner's income than if deductions of \$1,240 per year are allowed in the first 5 years of the sprinkler system's useful life.

Considering all the facts and circumstances, we hold that the payments made by petitioner for the installation of the sprinkler system in the amount of \$1,240 for each of the years 1951 and 1952, were not rental expenses within the meaning of section 23 (a) (1) (A) and, accordingly, respondent did not err in disallowing deductions therefor. *Benton* v. *Commissioner*, 197 F. 2d 745, reversing a Memorandum Opinion of this Court, and *Abramson* v. *United States*, 133 F. Supp. 677, relied upon by petitioner, are not only distinguishable on the facts but are not contrary in principle.

In view of the above holding, respondent's determination of additions to tax under section 294 (d) (2), I. R. C. 1939, was likewise correct.

*Decision will be entered for the respondent.*