STEVEN SCOTT KANETZKE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kanetzke v. Commissioner
Docket No. 1121-89
United States Tax Court
T.C. Memo 1991-152; 1991 Tax Ct. Memo LEXIS 171; 61 T.C.M. (CCH) 2337; T.C.M. (RIA) 91152; April 4, 1991, Filed *171 Decision will be entered for the respondent. W. F. Mason, Jr., for the petitioner. Deborah C. Stanley, for the respondent. RAUM, Judge. RAUM
MEMORANDUM OPINION The Commissioner determined deficiencies in petitioner's income taxes for the years 1982 and 1985 in the following amounts: Year
Amount
1982
$ 1,426
1985
8,408
Petitioner resided in Vinton, Virginia, when he filed the petition herein. The case was submitted on the basis of a stipulation of facts under Rule 122, Tax Court Rules of Practice and Procedure. The sole matter in dispute is whether petitioner purchased rather than leased certain equipment for which he claimed an investment tax credit and a deduction for depreciation for 1985. The year 1982 is involved merely by reason of a carryback from 1985. Petitioner, a dentist, was a sole practitioner. HPSC, Inc. (HPSC), a corporation with which petitioner does not appear to have any connection, as stockholder, officer, or otherwise, is engaged in dental equipment sales and leasing. On December 20, 1985, petitioner (as "lessee") and HPSC (as "lessor") entered into an agreement embodied in a document entitled "Equipment Lease Contract," described *172 as a "non-cancellable lease" with an "initial term" of five years, calling for 60 monthly lease payments of $ 1,399.34. The "lessor's total equipment cost" was $ 70,766.15. Pertinent portions of the agreement are as follows: 1. LEASE. Lessee hereby leases from lessor, and lessor leases to lessee, the personal property described above and in any schedule made a part hereof by the parties hereto (hereinafter called "equipment"). * * * 6. RENT PAYMENTS. The lessee agrees to pay during the initial term of this lease total rent equal to the number of rent payments specified above multiplied by the amount of each payment specified above. * * * 11. LABELS. If lessor supplies lessee with labels stating that the equipment is owned by lessor, lessee shall affix and keep the same upon a prominent place on each item of equipment. 12. REPAIRS. Lessee, at its expense, shall keep the equipment in good repair and furnish all parts, mechanisms and devices required therefor. * * * 13. ALTERATIONS. Lessee shall not make any alterations, additions or improvements to the equipment without lessor's prior written consent. All additions and improvements made to the equipment *173 shall belong to the lessor. 14. SURRENDER. Upon the expiration or earlier termination of this lease, lessee, at its expense, shall return the equipment in good repair, ordinary wear and tear resulting from proper use thereof alone excepted, by delivering it, packed and ready for shipment, to such place or carrier as lessor may specify. 15. LOSS AND DAMAGE. Lessee shall bear the entire risk of loss, theft, damage or destruction of the equipment from any cause whatsoever, and no loss, theft, damage or destruction of the equipment shall relieve lessee of the obligation to pay rent or of any other obligation under this lease. In the event of damage to any item or [sic] equipment, lessee shall immediately place the same in good repair. If lessor determines that any item of equipment is lost, stolen, destroyed or damaged beyond repair, lessee at the option of lessor shall: (a) replace the same of like equipment in good repair, or (b) pay lessor in cash all of the following (i) all amounts then owed by lessee to lessor under this lease, (ii) an amount equal to ten per cent (10%) of the actual cost of said item and (iii) the unpaid balance of the total rent for the initial term *174 of this lease attributable to said item. Upon lessor's receipt of such payment, lessee shall be entitled to whatever interest lessor may have in said item, in its then condition and location, without warranty express or implied. The parties hereto agree that the sum of the amounts numbered (ii) and (iii) will equal the fair value of said item on the date of such loss, theft, damage or destruction.
16. INSURANCE; LIENS; TAXES. Lessee shall provide and maintain insurance against loss, theft, damage or destruction of the equipment in an amount not less than the total rent payable hereunder, with loss payable to lessor. * * * Lessee shall pay all charges and taxes (local, state and federal) which may now or hereafter be imposed upon the ownership, leasing, rental, sale, purchase, possession or use of the equipment, excluding however, all taxes on or measured by lessor's net income. * * * 18. ASSIGNMENT. Without lessor's prior written consent, lessee shall not (a) assign, transfer, pledge, hopothecate or otherwise dispose of this lease or any interest therein, * * * Lessor may assign this lease and/or mortgage the equipment, * * * 23. OWNERSHIP; PERSONALITY. The *175 equipment is, and shall remain the property of lessor; and lessee shall have no right, title or interest therein or thereto except as expressly set forth in this lease. The equipment shall remain personal property even though installed in or attached to real property.
Thus, under the terms of this agreement, HPSC agreed to lease to petitioner certain dental equipment. The agreement stated that the equipment "is, and shall remain, the property of lessor; and lessee shall have no right, title or interest therein or thereto except as expressly set forth in this lease." In exchange for the use of the equipment, petitioner agreed, among other things, to make 60 monthly lease payments of $ 1,399.34, and to pay for repairs, insurance, and taxes, as summarized below. Paragraph 15 of the agreement, entitled "Loss and Damage," imposed upon petitioner the obligation to repair any equipment that might become damaged during the five-year term. If any of the equipment should become damaged beyond repair, or was lost, stolen, or destroyed, HPSC could require petitioner either to replace or to pay for that equipment. If HPSC chose the latter, petitioner would be required to pay (i) all amounts *176 he currently owed to HPSC under the agreement, (ii) a sum equal to 10 percent of the cost (to HPSC) of the item, and (iii) all amounts that would become due during the remainder of the five-year term. The loss, theft, damage, or destruction of the equipment would not relieve petitioner of any of his obligations under the agreement. Paragraph 16, entitled "Insurance; Liens; Taxes," required petitioner to pay all of the taxes imposed on the equipment except for taxes based on HPSC's net income. Thus, petitioner paid sales tax in the amount of $ 55.97 per month in addition to his monthly lease payments of $ 1,399.34, or a total of $ 1,455.31 per month. Paragraph 16 also required petitioner to insure the equipment against "loss, theft, damage or destruction" for the full amount due under the agreement, "with loss payable to lessor." Paragraph 18 empowered the lessor to mortgage the equipment. HPSC sent petitioner a letter dated December 6, 1985, together with the agreement for his signature, and it requested him to return the signed agreement "along with your check in the amount of $ 3,077.16, covering the security deposit of $ 3,052.16, (first and last month's payments) and $ 25.00 *177 filing fee." The monthly payment referred to in the letter included not only the basic amount of $ 1,399.34 plus $ 55.97 sales tax, but also $ 70.77 for insurance on the equipment. However, the letter explained that petitioner could avoid paying HPSC the additional $ 70.77 per month for insurance by providing proof that he had purchased his own all-risk casualty insurance from another source. Also, the letter stated that: At the end of sixty months, the following options may be available: 1. Return the equipment covered under the lease. 2. Provided that all the terms and conditions of your contract have been fulfilled, you may purchase said equipment for fair market value. Fair market value is estimated to be equal to 10 percent of equipment cost.
HPSC purchased the dental equipment from a local dental supply firm for $ 70,766.15. Respondent and petitioner have stipulated that at some undisclosed time or times, they contacted equipment dealers in Richmond and Roanoke, Virginia, respectively, for the purpose of obtaining estimates of the residual value of the equipment at the end of the "five (5)-year installment term." One such dealer, contacted by respondent, *178 estimated the residual value as $ 16,500. Two dealers contacted by petitioner estimated it as $ 22,800 and $ 26,775, respectively. The record does not contain any evidence that would qualify the respective dealers as experts, or the basis on which each made his estimate of the residual value, or whether such value, determined at the time the respective estimates were made, was based on hindsight, or otherwise. On his income tax return for 1985, petitioner in substance took the position that he acquired the dental equipment by purchase in 1985. He claimed a deduction for depreciation attributable to the equipment in the amount of $ 10,084, as well as a tentative investment tax credit of $ 7,077 relating to this equipment. Of this latter amount, he claimed $ 5,651 as a credit against his 1985 income taxes, and carried back the remaining $ 1,426 to his 1982 taxable year. The Commissioner determined that petitioner had leased instead of purchased the dental equipment. He disallowed petitioner's depreciation deduction and investment tax credit to the extent attributable to this equipment. The Commissioner instead allowed a deduction of $ 2,911, which represented the first and last *179 month's rent and sales taxes petitioner paid under the agreement. [1]
Petitioner was entitled to the investment tax credit and the depreciation deduction relating to the dental equipment if he purchased and thereafter owned the equipment, but not if he leased it. See section 48(a)(1); [2]Lockhart Leasing Co. v. Commissioner, 54 T.C. 301, 312-313 (1970), affd. 446 F.2d 269 (10th Cir. 1971). Petitioner's economic interest in the equipment depends upon the underlying facts. Cf. Lockhart Leasing Co., supra at 314. Stated somewhat differently in the context of this case, the issue is whether, on the facts, petitioner took possession of the equipment as "lessee" or whether he purchased *180 it from HPSC in an installment or conditional sale. For the reasons indicated below, we sustain the Commissioner's determination. In form, the agreement between petitioner and HPSC was plainly a lease, not a sale, and paragraph 23 specifically stated that petitioner had no ownership interest in the equipment. The Government's principal position is based upon Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), revg. 44 T.C. 549 (1965), which in essence precludes the taxpayer from challenging the tax consequences of his agreement as written unless he can present proof that would be admissible in an action between the parties to the agreement to alter its meaning because of mistake, undue influence, fraud, duress, etc. Although we decide this case in favor of the Government, we do not do so on the basis of Danielson. This Court has refused to accept *181 the procrustean standard of Danielson[3] except when compelled to do so by Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), in cases appealable to the Third Circuit or other circuits which have adopted Danielson. See, e.g., Coleman v. Commissioner, 87 T.C. 178, 202 n. 17 (1986), affd. without published opinion 883 F.2d 303 (3d Cir. 1987); G C Services Corp. v. Commissioner, 73 T.C. 406, 412 n. 2 (1979); Lucas v. Commissioner, 58 T.C. 1022 (1972). Instead, we have followed the less rigid, but nevertheless potent, "strong proof" standard. See Lucas v. Commissioner, 58 T.C. at 1032, where we stated: Where a taxpayer has entered into a written agreement * * * that provides for the specific terms of a transaction the tax consequences of which are in issue, we have applied the rule that "strong proof" must be adduced by the taxpayer if he seeks to establish a position at variance with the language of the agreement to which he was a party. * * * [Citations omitted.]
*182 Since the Fourth Circuit, to which this case is appealable, does not appear to have adopted Danielson, cf. Elrod v. Commissioner, 87 T.C. 1046, 1066 (1986), we apply the "strong proof" rule here, and hold that petitioner has not presented the requisite strong proof that his contract with HPSC, although entitled a lease, was actually a sale. To carry his burden, petitioner must show by strong proof that, as a purchaser, he bore the burdens and enjoyed the benefits of ownership of the equipment. In holding that petitioner has failed to carry his burden, we consider at least several aspects of the case in which the record persuasively points up petitioner's failure, or in which it tends affirmatively to support the Government's position. Preliminarily, we note that the parties have stipulated that the person who represented HPSC in the transaction, if called as a witness, would testify that the agreement was presented to petitioner as a lease, and that HPSC uses a different contract form for installment sales. In fact, HPSC's contract form for installment sales is an exhibit in this case. That form is captioned "Conditional Sales Agreement," and uses language *183 relevant to sales throughout ("seller," "buyer," etc.) in sharp contrast to the language in the "lease" agreement that is before us in this case. To be sure, petitioner has shown that he bears many of the burdens of ownership. Thus, the contract requires him, for example, to pay all taxes, insure the equipment, and repair or replace equipment that becomes damaged. But at least some of these burdens are of the type that might normally be required of a lessee as security or for protection of the interests of a lessor. And while it is true that bearing all these expenses may be indicative of ownership, cf. Transamerica Corp. v. United States, 7 Cl. Ct. 441, 449 (1985), that circumstance is not conclusive. Cf. LTV Corp. v. Commissioner, 63 T.C. 39, 50 (1974); Northwest Acceptance Corp. v. Commissioner, 58 T.C. 836, 839 (1972), affd. 500 F.2d 1222 (9th Cir. 1974); Lockhart Leasing Co. v. Commissioner, 54 T.C. 301, 303-304 (1970), affd. 446 F.2d 269 (10th Cir. 1971). The fact that petitioner bears such expenses does not, without more, satisfy his burden to adduce "strong *184 proof" that he purchased the equipment. The evidence that petitioner enjoyed the benefits of ownership is particularly weak. If the transaction were a sale rather than a lease, petitioner's monthly payments, even though denominated "rent," would result in his building up an equity in the equipment. See Kansas City Southern Railway v. Commissioner, 76 T.C. 1067, 1094 (1981). Thus, where the taxpayer's monthly payments are applied to decrease the exercise price of its option to purchase the property, the lessee as a result acquires something more than the mere use of the property. He is building up an equity in the property, and "it is an indication that the parties intended to enter into a sales agreement." Transamerica Corp. v. United States, 7 Cl. Ct. 441, 448 (1985). In the present case, however, petitioner's monthly payments gave him nothing more than the use of the equipment for the term of the lease. Petitioner attempts to make much out of his option to purchase at the end of the 60-month term. He contends that he had a right to purchase the equipment for 10 percent of its original cost of $ 70,766, or $ 7,076.60 (an amount that *185 he treats as "nominal"), where the property had an alleged estimated residual value of between $ 16,500 and $ 26,775. He argues that he would thus enjoy the benefits of ownership through his right to take advantage of increase in value, a right that is characteristically associated with ownership. However, as we will point out shortly, the matter is far from clear and certainly the record does not support petitioner's position by "strong proof." In the first place, petitioner has not established by "strong proof" that he has a legally enforceable right to purchase the equipment for 10 percent of its $ 70,766 cost, or $ 7,076.60. This is so for a number of reasons, any one of which would be fatal to his position: 1. The agreement itself does not contain any such option. Moreover, paragraph 24 of the agreement states "This instrument constitutes the entire agreement between lessor and lessee. No agent or employee of the supplier is authorized to bind lessor to this lease, to waive or alter any term or condition printed herein or add any provision hereto. Except as provided in paragraph 3 hereof [relating to multiple leases], a provision may be added hereto * * * only by a writing *186 signed and made a part hereof by an authorized officer of lessor." There is no evidence before us to the effect that any such option was ever added to the agreement. 2. The only place that there is anything about an option to purchase is in a letter on an HPSC letterhead signed by someone named Ronald Bechard, who is not otherwise identified. There was no proof, and certainly no strong proof, that he was an "officer" of HPSC, or, even if an officer, that he was an "authorized" officer. 3. The letter states that at the end of 60 months, if all the terms and conditions of the contract have been fulfilled, petitioner may purchase said equipment for fair market value. [Emphasis supplied.] And it then goes on to state in a separate sentence that "Fair market value is estimated to be equal to 10% of equipment cost." The letter is thus ambiguous, and is open to at least two sharply different interpretations. Does it mean that the option is to purchase at fair market value, whatever that amount may be, but that it is now estimated to be equal to 10 percent of equipment cost? Or does it mean that, regardless of what that value may turn out to be, petitioner is given a firm right *187 to purchase at 10 percent of cost? This ambiguity is plainly inconsistent with "strong proof." Petitioner has hardly established by "strong proof" -- indeed, even by the ordinary standard of proof -- that he is building up an equity in the equipment. As shown above, his proof rests on assumptions that are "full of holes" if examined in the light of the requisite rigorous standard of "strong proof." His proof fails to establish by any such standard not only that he had a fixed right to purchase the equipment for the alleged "nominal" price of $ 7,076.60 at the end of the five-year term of the lease, but also that at the time of execution of the agreement, the equipment had an anticipated "salvage" value at the end of five years in a range between $ 16,500 and $ 26,775. These latter figures are the stipulated estimates made by equipment dealers "contacted" by the parties hereto. The record fails to show whether these dealers would qualify as experts or the basis on which each reached his estimated value, or whether such values were determined as of the time of the estimates based on hindsight, or otherwise. Petitioner makes another argument based upon a sentence in the agreement *188 that "It is the intention of both the lessee and lessor to treat this contract as a leasing transaction under section 168(f)(8) of the Internal Revenue Code of 1954." He contends that the printed form agreement had previously been drafted with a view to taking advantage of section 168(f)(8), a provision that was no longer in the Code in 1985 when the agreement was signed. In effect, he asks us to ignore the entire form of the agreement as a lease and to treat it as an installment or conditional sales agreement. However, the fact is that, for whatever reason, the parties voluntarily used the form creating a lease. And, as has already been indicated above, petitioner must show by strong proof that this form did not reflect the substance of the agreement between the parties. He has not done so, and is accordingly bound by the form of the instrument as executed. We need not pursue the matter further. To be sure, even if this may be thought to be a close case on the merits, it would be at most "near a frontier, with large hinterlands on either side." Petschek v. United States, 335 F.2d 734, 737 (2d Cir. 1964); Borchers v. Commissioner, 95 T.C. 82, 93-94 (1990). *189 Cf. also in this connection Welch v. Helvering, 290 U.S. 111, 116, 78 L. Ed. 212, 54 S. Ct. 8 (1933). However, we think the correct result is along the lines reached by this Court in LTV Corp. v. Commissioner, 63 T.C. 39 (1974); Northwest Acceptance Corp. v. Commissioner, 58 T.C. 836 (1972), affd. 500 F.2d 1222 (9th Cir. 1974); and Lockhart Leasing Co. v. Commissioner, 54 T.C. 301 (1970), affd. 446 F.2d 269; (10th Cir. 1971). Indeed, the result here follows a fortiori from those cases. Although the documents there involved were also leases in form, the taxpayers in those cases relied upon the form of the transactions, and were required merely to establish by the ordinary burden of proof that the transactions were leases rather than sales in substance as well as in form. Cf. Frank Lyon Co. v. United States, 435 U.S. 561, 55 L. Ed. 2d 550, 98 S. Ct. 1291 (1978). Here, on the other hand, petitioner wants us to reject the form of the transaction he has entered into, but can succeed only if he can establish by the more rigorous standard of "strong proof" that his agreement with HPSC in the form of a lease *190 was in substance a sale. We find that he has failed to do so. Decision will be entered for the respondent. Footnotes
1. Apparently, petitioner had purchased insurance on the equipment so that his total monthly payment amounted to $ 1,455.31. The $ 2,911 allowed by the Commissioner was obviously twice that amount (representing the first and last month's payments) rounded to the nearest dollar.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years at issue.↩
3. The Government has attempted to associate with Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967),the Supreme Court's statement in Commissioner v. Nat. Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149, 40 L. Ed. 2d 717, 94 S. Ct. 2129 (1974), to the effect that "while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not [citations omitted], and may not enjoy the benefit of some other route he might have chosen to follow but did not." Although this statement might teasingly appear to be related to Danielson, it was in fact directed to an entirely different matter. The issue in Nat. Alfalfa was whether the taxpayer there would be treated as having pursued a course of action different from the one it had in fact followed. By contrast, the issue here involves the proper characterization of the course of action actually followed by petitioner. We in no way intend to depart from Nat. Alfalfa↩, but we find it inapplicable here.